IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| TIM A. DUNLAP, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  CV04-223-S-EJL |
| | ) | |
| vs. | ) | **MEMORANDUM ORDER** |
| | ) | |
| JAY GREEN, GREG FISHER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Pending before the Court in this case is Defendants' Motion for Summary Judgment (Docket No. 41).  Plaintiff has filed a response, as well as two supplements (Docket Nos. 45, 46, and 47).  Having reviewed the parties' filings, the Court concludes that a hearing is unnecessary to resolve the pending Motion for Summary Judgment.  Accordingly, the Court enters the following Order.

## I.

## BACKGROUND

Plaintiff was convicted of first degree murder and sentenced to death in 1992.  All inmates sentenced to death were formerly housed in solitary confinement ("death row"), pursuant to state statute.  On July 1, 2003, the Idaho legislature amended the statute and vested the Warden of the Idaho Maximum Security Institution (IMSI) with the discretion to determine the housing assignments of inmates who are under a death sentence but not under a death warrant.  *See* Idaho Code § 19-2705, which superseded former Idaho Code § 19-

**MEMORANDUM ORDER  1**

2706.

On July 3, 2003, Plaintiff was housed in the Idaho Secured Mental Facility (C-3) of IMSI. He was later housed in the mental health outpatient unit (C-2), as recommended by Idaho Department of Correction (IDOC) mental health staff. Plaintiff's death sentence was vacated in 2005. As a result, he was placed in the custody of Caribou County and was not housed in an IDOC facility from approximately February 23, 2005, to February 23, 2006. On February 22, 2006, he was resentenced to death, whereupon he was returned to IMSI.

## II.

## STANDARD OF LAW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In a motion for summary judgment, the moving party bears the "initial burden of identifying for the court those portions of the record which demonstrate the absence of any genuine issues of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986)). If the moving party points to portions of the record demonstrating that there appears to be no genuine issue of material fact as to claims or defenses at issue, the burden of production shifts to the non-moving party. To meet its burden of production, the non-moving party

**MEMORANDUM ORDER  2**

"may not rest upon the mere allegations contained in his complaint, but he must set forth, by affidavits, exhibits or otherwise, specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56; *see T.W. Electric Serv.*, 809 F.2d at 630 (internal citation omitted).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences that can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31 (internal citation omitted).

Rule 56(c) requires the Court to enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby*, 477 U.S. at 252.

Under the Equal Protection Clause, "all persons similarly circumstanced shall be treated alike" by governmental entities. *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920). However, "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147 (1940).

Equal protection claims alleging disparate treatment or classifications are subject to a heightened standard of scrutiny when they involve a "suspect" or "quasi-suspect" class, such as race or national origin, or when they involve a burden on the exercise of

**MEMORANDUM ORDER  3**

fundamental personal rights protected by the Constitution.  *See, e.g., City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440 (1985).  Otherwise, equal protection claims are subject to a rational basis inquiry.  *See Heller v. Doe by Doe*, 509 U.S. 312, 319-20 (1993).  Accordingly, inmate classification decisions not based on a suspect or quasi-suspect class are subject to a rational basis analysis.  *See Allgood v. Morris*, 724 F.2d 1098, 1100 (4th Cir. 1984).

In order to prevail on an equal protection claim, Plaintiff must demonstrate that he is being treated in a disparate manner, and that there is no rational basis for the disparate treatment.  *More v. Farrier*, 984 F.2d 269, 271 (8th Cir. 1993).  Stated another way, prison officials need show only a rational basis for dissimilar treatment in order to defeat the merits of Plaintiff's claim.  *Id.*, 984 F.2d at 271.  Where a case "does not rise to the level of invidious discrimination proscribed by the Equal Protection Clause. . . , the federal courts should defer to the judgment of the prison officials."  *More*, 984 F.2d at 272.

Plaintiff's equal protection claims are also cognizable under the theory that he is a "class of one," because he has asserted that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  "[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  *Id.* at 564 (internal citation omitted).

**MEMORANDUM ORDER  4**

Prison housing assignments are functions wholly within the discretion of the prison administration. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Meachum v. Fano*, 427 U.S. 215, 225 (1976). The Supreme Court has cautioned the federal courts not to interfere with the day-to-day operations of the prisons, especially those things related to security, a task which is best left to prison officials who have particular experience in dealing with prisons and prisoners. *See Turner v. Safley*, 482 U.S. 78, 89 (1987) (First Amendment claims).

## III.

## DISCUSSION

### A.   Plaintiff's Claims

Plaintiff's claims arise from the time period between July 1, 2003, when the Idaho statute changed to allow inmates under sentences of death to be housed in assignments other than isolation units, and June 23, 2005, when he was transported to Caribou County for his resentencing hearing.

Plaintiff asserts that he was treated differently from four other inmates were who removed from death row as a result of the statute change and placed within the general population. Defendants Warden Greg Fisher and Sergeant Jay Green counter that Plaintiff was not similarly situated to those inmates, and that his housing placement had a rational basis because it was based on the recommendations of mental health providers.

### B.   Plaintiff's Initial Placement after Discretionary Statute was Enacted

When the statute became effective, Warden Fisher based his initial decision to house

**MEMORANDUM ORDER  5**

Plaintiff in the mental health unit at IMSI on Plaintiff's prior behavior and the treatment recommendations of his mental health treatment providers. *Warden Greg Fisher Affidavit*, at ¶ 6 (Docket No. 41-5); *Dr. Chad Sombke Affidavit*, at ¶¶ 13-16 (Docket No. 41-3).

Plaintiff's prior behavior included threatening to cut off correctional officers' heads, writing an Inmate Concern Form with blood or feces rather than ink, and talking delusionally and resisting an escort after taking a shower. *Fisher Affidavit*, Exhibits C, G, and H. Warden Fisher notes that since Plaintiff has been incarcerated, he has been convicted of 24 separate disciplinary offenses, of which 12 occurred in the year 2000, and three in 2001. *Fisher Affidavit*, at ¶ 20 & Exhibit B.

As part of his mental health treatment, Plaintiff had been prescribed a number of psychotropic drugs by Dr. Khatain, the psychiatrist, to reduce Plaintiff's preoccupation with troublesome recurring thoughts and seeing and hearing things not normally seen and heard. *Sombke Affidavit*, ¶¶15-16.

### C.     Placement of Other Death Row Inmates

Warden Fisher notes that three of the other former death row inmates who have been in general population and to whom Plaintiff compares himself (Porter, Fetterly, and Hoffman) did not require mental health treatment to the extent that it was necessary to house them in the mental health treatment units located in C-2 or C-3. *Fisher Affidavit*, at ¶ 11. The fourth former death row inmate, Leavitt, was housed in C-2 from March 6, 2002, to September 4, 2002, for an assessment of whether he could successfully integrate into a more socialized prison environment after having been held in solitary confinement since 1985.

**MEMORANDUM ORDER  6**

*Fisher Affidavit*, at ¶ 12.  After his assessment, Leavitt was transferred from C-2 to general population.  *Id*.

### D.      Plaintiff's Movement from C-3 to C-2

After Plaintiff was placed in the Mental Health Unit in C-3, he progressed to the point where Dr. Sombke believed Plaintiff should be moved to the outpatient mental health facility in C-2.  *Fisher Affidavit*, at ¶ 27; *Sombke Affidavit,* at ¶ 24.  At a restrictive housing review meeting, five staff members, including Defendant Sergeant Jay Green, recommended that Plaintiff be moved to C-2.  Warden Fisher affirmed the decision on August 11, 2003.  *Fisher Affidavit*, at ¶ 28.  Plaintiff was moved to C-2 on August 12, 2003.  *Sombke Affidavit*, at ¶ 28.

Plaintiff's housing assignment, C-2, is an outpatient mental health clinic setting that houses inmates with mental disorders who are stable and can be transitioned into a more pro-social environment.  C-2 residents are given greater access to the unit's dayroom and outdoor recreation, and have increased opportunities to interact with other inmates and staff.  *Sombke Affidavit*, at ¶ 9.

### E.      Consideration of Moving Plaintiff from C-2 to General Population

On February 15, 2005, a restrictive housing placement committee reviewed Plaintiff's housing assignment.  The record of the meeting shows that there was a concern about Plaintiff being able to function in isolation or in general population.  At that time, Plaintiff told the committee that he did poorly in isolation, but was doing very well in C-2.  *See Fisher Affidavit*, Exhibit K.  Dr. Sombke recommended that Plaintiff remain in C-2, noting that he had been compliant with his medication and was doing well.  Based on this recommendation,

**MEMORANDUM ORDER  7**

which was affirmed by the committee, Warden Fisher authorized Plaintiff's continued housing in C-2.  *Fisher Affidavit*, at ¶¶ 30- 31.

While in C-2, Plaintiff had several episodes of inappropriate behavior, beginning in October 2, 2003, when he began to isolate himself and exhibit offensive hygiene habits, and again on January 22, 2004, when the same symptoms occurred.  In light of all of the foregoing, Dr. Sombke opines that Plaintiff was housed appropriately at all times during his incarceration at IMSI.  *Sombke Affidavit*, at ¶¶ 27-34.  Dr. Sombke also states that "[a]lthough [Plaintiff] often requested to be placed in the general population, it is my opinion that C-2 was the more appropriate housing for Mr. Dunlap because his behavior never fully stabilized to the point where prison administration could be comfortable housing him in general population."  *Id.* at ¶ 38.

For the most part, Plaintiff remained in C-2 housing until February 26, 2005, when he was returned to Caribou County's custody for resentencing.  Plaintiff remained in Caribou County's custody for approximately one year until he was resentenced to death on February 22, 2006.  He was then returned to IMSI.

**F.     Analysis and Conclusion**

Plaintiff has provided no evidence to show that Defendants were acting arbitrarily in determining his housing placement, rather than following the recommendations of the mental health providers at the prison and relying on his prior prison record, which contains some very disturbing behavioral problems.  Plaintiff has not shown that he is similarly situated to other inmates with death sentences, nor has he shown that he has been singled out for an

**MEMORANDUM ORDER  8**

arbitrary housing assignment. The Court also rejects Plaintiff's other arguments, such as his contentions that (1) there is a conspiracy to prevent his and other IMSI prisoner claims from going to trial, and (2) failure to allow him to have a pet is an Eighth Amendment cruel and unusual punishment violation (Docket Nos. 45, 46 & 47).

Because there is a rational basis for Defendants' decision to house Plaintiff in C-Block, his equal protection rights have not been violated. Prison housing assignments are functions wholly within the discretion of the prison administration. *See Olim v. Wakinekona*, 461 U.S. at 245; *Meachum v. Fano*, 427 U.S. at 225. Here, there is ample evidence supporting Defendants' decision to house Plaintiff in C-block. The Court will not second-guess prison officials when security interests are at stake. *See Turner v. Safley*, 482 U.S. at 89. Plaintiff's Complaint shall be dismissed with prejudice.

**MEMORANDUM ORDER  9**

## IV.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (Docket No. 41) is GRANTED. Plaintiff's case is dismissed with prejudice.

IT IS FURTHER HEREBY ORDERED that Defendants' Motion for a Stay (Docket No. 40) is MOOT now that Plaintiff has been returned to the custody of the Idaho Department of Correction.

DATED: **September 6, 2006**

Honorable Edward J. Lodge
U. S. District Judge

**MEMORANDUM ORDER  10**